IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-CR-147 |
| | ) | (VARLAN/GUYTON) |
| OMAR M. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Omar M. Smith's Motion to Suppress [Doc. 11], filed on December 18, 2009. The Court held an evidentiary hearing on this motion on January 12, 2010. Assistant United States Attorney Alexandra Hui represented the Government. Attorney Jonathan A. Moffatt appeared on behalf of the Defendant, who was also present. At the conclusion of the hearing, defense counsel requested the opportunity to file a post-hearing brief. The Government did not object and requested the opportunity to respond. Both parties filed supplemental briefs [Docs. 18 and 19] on February 3, 2010. The Court took the motion, the related filings, and the evidence under advisement on February 4, 2010.

# I. POSITIONS OF THE PARTIES

The Indictment [Doc. 1] charges the Defendant with a single count of being a felon in possession of a firearm and ammunition on July 3, 2009. The Defendant asks [Doc. 11] the Court to suppress all evidence obtained and any statements resulting from the seizure and search of his person on July 3, 2009. He contends that he was illegally seized in violation of the Fourth Amendment because the seizing officers did not have reasonable suspicion that he was involved in criminal activity or probable cause to arrest him. Additionally, he argues that he was illegally searched because the officers lacked reasonable suspicion that he was armed and dangerous such to justify a Terry frisk of his person and he had not been arrested at the time he was searched. Finally, he maintains that any statements he made during the incident were the fruit of the illegal seizure and violated his rights under the Fifth and Sixth Amendments.

The Government responds [Doc. 14] that officers answering a call regarding a domestic dispute had probable cause to arrest the Defendant for public intoxication and disorderly conduct. The Defendant was properly searched incident to his arrest, and a firearm and ammunition were seized from his person. The Government concedes that statements by the Defendant after he was arrested and placed in the police cruiser but before he received the Miranda warnings are not admissible. It contends, however, that answers to routine booking questions and any statements by the Defendant after he was advised of his rights should not be suppressed.

# II. SUMMARY OF THE TESTIMONY

At the January 12, 2010 evidentiary hearing, the Government called Sergeant Greg Coker of the Knoxville Police Department (KPD). Sgt Coker testified that on July 3, 2009, he

received a call from the police dispatcher, reporting a fight involving two males and a female at 2000 Washington Avenue, Apartment A. Sgt Coker was not far from that location and was the first officer to arrive on the scene. At the door, he encountered a male[1] attempting to leave the residence. The man was disheveled and appeared to have been in a fight. Although the man stated that he was "okay," Sgt Coker did not permit the man to leave because he needed to determine if an assault had occurred and, if so, who was the perpetrator. A female and the Defendant were also present in the kitchen of the residence. When Sgt Coker would not allow him to leave, the man stepped into a room immediately to the left of the entry. The man had one hand in his pocket. Concerned for his own safety, Sgt Coker asked the man to remove his hand from his pocket, but the man did not comply. Sgt Coker physically removed the man's hand from his pocket and discovered that the man was holding what appeared to be a crumbled piece of crack cocaine.

Sgt Coker testified that as he was interacting with the man, he saw the Defendant walk past the room's doorway toward the door of the residence. Sgt Coker followed the Defendant, pulling the man with him. When he got to the door, he saw that Officers Thornton and Schreiber had arrived, and he called to Officer Thornton to stop the Defendant and bring him back to the porch. Sgt Coker testifed that the Defendant had stepped off the porch and was heading toward Bertrand Street. Sgt Coker said he did not want the Defendant to leave because he was still investigating the assault and drug possession. The other officers explained to the Defendant that he had to return to the porch. The Defendant was loudly exchanging words with the officers.

---

[1]Sgt Coker did not recall the name of this individual, who is identified as Lester Marvin Walter, Jr., and, alternatively, as Mr. Walton in the Defendant's motion [Doc. 11]; was called Mr. Wilson at the hearing by the Government; and was called Mr. Walton at the hearing by defense counsel.

Sgt Coker stated that once the Defendant was on the porch, the Defendant attempted to move quickly past him and into the house. Sgt Coker tried to grab the Defendant, who pulled away. Sgt Coker stated that he was concerned for everyone's safety and performed a "leg-sweep takedown" on the Defendant, causing the Defendant to fall face down onto the porch. Once the Defendant was lying on the porch, Officer Thornton frisked him while Sgt Coker held him down. During the frisk, Officer Thornton said, "Gun, gun," indicating that he had found a gun. Sgt Coker stated that during this time, a neighbor from Apartment B and one or two other people were watching from across the street. Sgt Coker testified that after the Defendant was secured, he noticed the odor of alcohol on his breath. Officer Thornton, who was the arresting officer, took the Defendant to his patrol car, and Sgt Coker continued his investigation of the other two individuals in the residence.

On cross-examination, Sgt Coker testified that he received the radio dispatch regarding the incident around 11:40 a.m.[2] In addition to hearing the police radio dispatch of the 911 call, he received a "call screen" on the computer in his patrol car that gave the address, the type of call, and details about the call. He agreed that he did not receive any information that there were weapons at 2000 Washington Avenue. Sgt Coker had never been to 2000 Washington Avenue before, and when he arrived, three people, a man, the Defendant, and Ms. Octavia Hicks, were present inside the residence. He first came into contact with the man, whom Sgt Coker vaguely recalled had a small amount of blood on his face. Sgt Coker agreed that Ms. Hicks was yelling during his investigation. He stated that there appeared to be something wrong with her and that he

_____

[2]Although Sgt Coker agreed with counsel that the time was "approximately 11:40 in the afternoon," he also agreed that the call came "before noon." Moreover, the video footage reveals that the events occurred during the daytime.

believed that she was "geeking," meaning either under the influence of crack cocaine or coming off of it. Following the Defendant's arrest, Ms. Hicks told Sgt Coker that the Defendant was her former boyfriend and the other man was her current boyfriend. Sgt Coker testified that after the Defendant was taken into custody, "everything aggressive stopped," and the officers were able to investigate what had occurred at the residence.

Sgt Coker testified that when the other officers arrived, the Defendant had stepped off the porch, had walked past the end of the porch, and was almost to Bertrand Street. He told the other officers, "Don't let him leave," but he did not tell them to arrest the Defendant. He had not detected the smell of alcohol on the Defendant at this point. Once the officers told the Defendant to stop, the Defendant stopped. The officers told the Defendant to return to the porch, but he initially did not comply. The officers convinced the Defendant to return to the porch, where he then tried to move quickly into the residence. At this point, the man, whom Sgt Coker had met first upon his arrival and whom he had brought with him from inside the residence, was lying on the porch at Sgt. Coker's direction. Sgt. Coker stopped the Defendant from entering the house, and the Defendant tired to pull away from him. Sgt Coker swept the Defendant's legs from under him, causing the Defendant to fall onto the porch. He held the Defendant down, while Officer Thornton frisked him. At this point, he smelled alcohol on the Defendant because he was in close proximity to the Defendant.

Sgt Coker testified regarding the video recording [Exhibit 2] from the camera in his police car. At 11:54:35 on the video, Sgt Coker approached the house. By 11:55:28, the Defendant had left the house and walked toward Bertrand Street. The Defendant stopped. As Officers Thornton and Schreiber approached, the Defendant walked back toward the porch. The Defendant

stepped onto the porch and was no longer visible on the video. At 11:58:39, the video shows Officers Thornton and Schreiber taking the Defendant to Officer Thornton's car. Officer Coker testified that the Defendant was taken to the police car immediately after the gun was discovered on his person. He stated that neither the man whom he had first encountered nor Ms. Hicks were taken into custody that day and that neither of them were charged with any crimes.

On redirect examination, Sgt Coker testified that the police code on the call screen he received regarding the 911 call was 1059, which is the code for a fight rather than a domestic dispute. Based upon his training and experience, the circumstances upon his arrival at 2000 Washington Avenue, particularly Ms. Hicks yelling and the man bleeding, caused him to believe that something violent had transpired. He attempted to contain the scene while he determined who the victims and perpetrators were. Sgt Coker stated that by leaving the residence, the Defendant was attempting to leave the scene, a circumstance that caused him to believe that the Defendant may have been at fault.

Officer Timothy Evan Thornton testified that he had been employed with the KPD for four years, working as a school resource officer during the school year and as a patrol officer during the summer. While writing out a traffic citation on July 3, 2009, he received a radio dispatch regarding a fight. As soon as he finished with the traffic stop, he and Officer Schreiber drove to 2000 Washington Avenue because he knew Sgt Coker was there unassisted. Upon arrival, he got out of his patrol car and saw the Defendant in the yard in front of the residence. The Defendant was backing away from the property and was yelling, "I didn't do anything. I didn't do anything." As Officer Thornton and Officer Schreiber approached, Thornton saw Sgt Coker standing partially inside the residence. Sgt Coker appeared to be dealing with another person and said, "I need him

to come back up. I couldn't get him up here." Officer Thornton testified that both Sgt Coker's superior rank and his experience caused Thornton to act on that request. He also stated that based upon his training and experience, when he saw someone attempting to leave and denying their involvement, it indicated to him that the person wanted to get away because criminal activity had occurred.

Officer Thornton testified that when he got close to the Defendant, he could smell alcohol on him. Officer Schreiber walked behind the Defendant and caused the Defendant to step onto the porch. Once the Defendant stepped onto the porch, he became more aggressive. As Officers Thornton and Schreiber were leading the Defendant to Sgt Coker to continue the investigation, the Defendant, who was still yelling, jerked or pulled away aggressively. Sgt Coker placed the Defendant face down on the porch. At this point, Officer Thornton noticed that because of the yelling, people were gathering to watch what was occurring. Officer Thornton took control of the Defendant and decided to arrest him for disorderly conduct and public intoxication, due to the odor of alcohol on him, his bloodshot eyes, and his belligerence. He patted the Defendant down. When Officer Thornton attempted to frisk the Defendant's left side, the Defendant rolled onto that side and pushed Thornton's hand away with his arm. As Thornton pushed the Defendant back over, he felt the end of a gun. Officer Thornton pulled the gun out of the Defendant's pocket and handed it to Officer Schreiber.

Officer Thornton identified video footage [Exhibit 3] from Officer Schreiber's in-car camera. He stated that Officer Schreiber arrived at the residence just seconds before him and that he parked behind Officer Schreiber. Officer Thornton identified the Defendant in the yard of the residence, wearing a yellow shirt. The video shows another male walking near the residence, and

Officer Thornton testified that an older woman was also watching from across the street. At 11:56:04 on the recording, Officer Thornton told the Defendant not to reach because he did not know what the Defendant had on his person. He then asked the Defendant for identification. After he frisked the Defendant, he escorted the Defendant to his police car. Once in the cruiser, he attempted to identify the Defendant. The Defendant refused to give his name at first, and Officer Thornton subsequently learned the Defendant's name from his insurance card. Officer Thornton then transported the Defendant to the intake center.

On cross-examination, Officer Thornton testified that Sgt Coker was the first officer on the scene and had more information about what was occurring than he did when he arrived. Officer Thornton had not received any information that weapons were involved and had not dealt with the Defendant before. The Defendant was "screaming" that he did not do anything, and Sgt Coker asked Officer Thornton to bring the Defendant back to the porch. The officers directed the Defendant to the porch, and Officer Thornton stated that he may have had his hand on the Defendant's back or arm, guiding him to the porch. Sgt Coker did not say anything about alcohol and did not direct Officer Thornton to arrest the Defendant. As the officers were talking to the Defendant, he became aggressive and began pulling away. Then, Sgt Coker placed him on the porch. At that point, Officer Thornton decided to arrest the Defendant, but he did not tell the other officers or the Defendant that he was arresting him because he thought that might make the situation more volatile. He agreed that he did not advise the Defendant of his Miranda rights at that time and that he did not know the Defendant's name.

Officer Thornton testified about the video footage [Exhibit 4] taken by the camera inside his patrol car. At 10:48:16 on the video, Officer Thornton parked behind Officer Schreiber

near the residence. When Officer Thornton approached the Defendant, the Defendant said, "I didn't do nothing." As Officer Thornton escorted the Defendant back to the porch, he told the Defendant, "When you are told to do something, do it." At 10:49:01, Officer Thornton asked the Defendant for identification, while a woman was yelling in the background. Officer Thornton admitted that although he told the Defendant not to reach into his pockets, he also asked for his identification. Officer Thornton told the Defendant that he did not want to get stuck with anything. Officer Thornton explained that he would have said this regardless of whether he was searching inside a pocket or patting the outside of a pocket because he could be stuck by a needle through the Defendant's pants. Officer Thornton stated that if he searched inside the Defendant's pockets while he was lying on the porch, it was because the Defendant was already under arrest. At 10:49:59, Officer Thornton searched the Defendant on the porch to make sure that he did not have any weapons. Officer Thornton agreed that the search occurred less than three minutes from the time that he arrived on the scene. At 10:50:21, Officer Thornton announced that the Defendant had a pistol. At 10:51:16, the Defendant, who had been handcuffed, was led to Officer Thornton's car. Officer Thornton agreed that he had not mentioned anything about alcohol to the Defendant or the other officers at this point.

On redirect examination, Officer Thornton stated that before arriving on the scene, he knew that a 911 caller had reported a fight at that location. He stated that he had the authority to arrest persons without his supervisor ordering him to do so. On recross-examination, Officer Thornton testified that in a volatile situation like this one, he would not announce that he was arresting the individual because that might cause the arrestee to become more aggressive. In General Sessions warrants, Officer Thornton charged the Defendant with public intoxication,

disorderly conduct, and possession of a firearm because he did not then know that the Defendant was a felon.

## III. FINDINGS OF FACT

The Court makes the following factual findings based upon the evidence presented at the suppression hearing, including the Court's own review of the video recordings: In the late morning of July 3, 2009, KPD Sgt Greg Coker received a police dispatch of a 911 call reporting a fight between two males and a female at 2000 Washington Avenue, Apartment A. He drove straight to the residence and went to the door, where he first encountered a disheveled male, attempting to leave the residence. The man had a small amount of blood on his face and appeared to have been in a fight. A female and the Defendant were in the kitchen of the residence. Sgt Coker did not permit the man to leave, and the man went into a room to the left of the door. The man had his hand in his pocket and did not comply with Sgt Coker's request that he remove it. Sgt Coker physically removed the man's hand from his pocket and saw that the man was holding what appeared to be a crumbled piece of crack cocaine.

While Sgt Coker was dealing with the man, the Defendant walked past the door to the room and toward the front door. Sgt Coker followed the Defendant, pulling the first man along with him. When Sgt Coker got to the door of the residence, the Defendant had stepped off the porch, had walked past the length of the porch heading toward Bertrand Street, and then stopped. The video recording from Sgt Coker's in-car camera reveals that Sgt Coker yelled for the Defendant to return to the porch. Officers Thornton and Schreiber, who had also received the radio dispatch of a fight at 2000 Washington Avenue, arrived on the scene. As they approached the Defendant, he was yelling that he did not do anything. Sgt Coker called to the other officers to bring the Defendant

back to the porch.

Officers Thornton and Schreiber approached the Defendant in the yard of 2000 Washington Avenue as the Defendant continued to yell that he had not done anything and to back toward Bertrand or to step from one foot to the other. When he was close to the Defendant, Officer Thornton smelled alcohol on the Defendant's person. The video recordings reveal that the Defendant walked to and stepped onto the porch with Officers Thornton and Schreiber following closely behind him. Once he stepped onto the porch, the Defendant attempted to move quickly past Sgt Coker and into the house. Sgt Coker grabbed the Defendant, who immediately jerked out of his grasp. Sgt Coker swept his leg under the Defendant causing him to fall face down onto the porch.

Once the Defendant was lying on the porch, Officer Thornton frisked him while Sgt Coker restrained him. While holding the Defendant down, Sgt Coker smelled the odor of alcohol on the Defendant's person. Officer Thornton asked the Defendant if he had identification and then warned the Defendant not to reach for anything. Officer Thornton then asked if anything would stick him. When Officer Thornton attempted to frisk the Defendant's left side, the Defendant rolled onto that side and pushed Thornton's hand away with his arm. As Officer Thornton pushed the Defendant back over, he felt the end of a gun inside the Defendant's pants, and he alerted the other officers by saying, "Gun, gun." Officer Thornton pulled the gun out of the Defendant's pocket and handed it to Officer Schreiber.

The Defendant was handcuffed on the porch, and then Officer Thornton escorted the Defendant to his patrol car. The entire incident from the time of Sgt Coker's arrival at the residence to the time the Defendant was escorted to the police car took four and one-half minutes. During the course of the incident, the female inside the house was yelling, and at least two people had gathered

outside to watch what was happening. Officer Thornton did not advise the Defendant of the <u>Miranda</u> warnings, either on the porch or in the patrol car. Officer Thornton subsequently sought General Sessions Court warrants against the Defendant for public intoxication, disorderly conduct, and possession of a firearm.

# IV. ANALYSIS

The Defendant challenges the warrantless seizure and search of his person, contending that (1) the officers lacked reasonable suspicion or probable cause to seize his person, (2) the officers could not lawfully frisk or search him, and (3) any statements he made that day must be suppressed as fruit of the illegal search. The Court will address each of these issues in turn.

## A. Seizure

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Not every contact between a police officer and a member of the public is a seizure. <u>United States v. Winfrey</u>, 915 F.2d 212, 216 (6th Cir. 1990). "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause."

<u>United States v. Pearce</u>, 531 F.3d 374, 380 (6th Cir. 2008). A police-citizen encounter does not

implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant reasonably to believe that compliance is compelled.  United States v. Collis, 766 F.2d 219, 221 (6th Cir.), cert denied, 474 U.S. 851 (1985).  Nor is there any Fourth Amendment implication before a defendant is even stopped or searched.  United States v. Saucedo, 226 F.3d 782, 789 (6th Cir. 2000).

The Court will first consider at what point during the incident the Fourth Amendment was implicated.  Next, it will analyze whether the police had reasonable suspicion at that point.

*1. Timing of Seizure*

The test for when the individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave.  Michigan v. Chesternut, 486 U.S. 567, 573 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990).   As noted above, "[a]bsent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled," an officer's request for identification or information is not a seizure.  Collis, 766 F.2d at 221 (holding that officer's request that defendant accompany him to the baggage claim area to retrieve a driver's license was not a seizure).

Here, the Defendant was inside 2000 Washington Avenue and not in a public place when Sgt Coker responded to the dispatch of the 911 call, but Sgt Coker did not detain or even question the Defendant when he first entered the residence.  While Sgt Coker was interacting with the other male in the residence, the Defendant left, passing by the doorway to the room containing Sgt Coker and the man.  Upon seeing the Defendant walk past the doorway, Sgt Coker followed him,

pulling the other man along with him. There is no testimony, nor did the audio portion of the recording from Sgt Coker's tape [Exhibit 2] reveal, that Sgt Coker attempted to stop the Defendant on his way out of the residence. Thus, nothing to this point indicates that the Defendant did not feel free to leave and, in fact, he did leave.

The Defendant proceeded out the door, off the porch, and toward Bertrand Street. When Sgt Coker got to the porch, he yelled for the Defendant to return to the porch. Although he stopped and turned toward the porch, the Defendant did not submit to Sgt Coker's request but, instead, began yelling that he did not do anything and either shifting from one foot to the other or backing toward Bertrand. The Supreme Court has held that for Fourth Amendment purposes, a seizure does not occur, even if an officer makes a show of authority, when the suspect does not yield. California v. Hodari D., 499 U.S. 621, 626 (1991); see also Smith, 594 F.3d at 536; United States v. Williams, 949 F.2d 220, 222 (6th Cir. 1991). In Hodari D., the defendant and others fled at the sight of a law enforcement officer's car and from the subsequent chase by an officer. Id. at 623. The legal issue was whether the defendant was seized by virtue of the officer running toward him and whether this seizure was unreasonable under the Fourth Amendment such that the evidence of cocaine should be suppressed. Id. The Supreme Court held that:

> The word "seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. . . . . It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure. . . . . An arrest requires either physical force (as described above) or, where that is absent, submission to the assertion of authority.

Id. at 626. Thus, the Court concluded that assuming the officer's pursuit of the defendant was a

show of authority, the defendant was not seized until he was tackled because he did not submit to that authority.  Id. at 629.  Similarly, in the present case, although Sgt Coker made a show of authority by yelling to the Defendant to return to the porch, the Defendant did not submit and, thus, was not seized.

Immediately thereafter, however, the situation changed.  Sgt Coker called to Officers Thornton and Schreiber, who had arrived and were approaching the Defendant in the yard, to bring the Defendant to the porch.  When Officers Thornton and Schreiber came up to him, the Defendant began walking to the porch with the officers following just behind him.  Once on the porch, the Defendant attempted to move quickly into the house but was quickly restrained by Sgt Coker.  Only a few seconds elapsed between the time that the Defendant started walking toward the porch and the point  that he was restrained.

The Supreme Court has enumerated certain factors that can indicate a seizure:

> Examples of circumstances that might indicate a
> seizure, even where the person did not attempt to
> leave, would be the threatening presence of several
> officers, the display of a weapon by an officer,
> some physical touching of the person of the citizen,
> or the use of language or tone of voice indicating
> that compliance with the officer's request might be
> compelled.

United States v. Mendenhall, 446 U.S. 544, 554 (1980); Smith 594 F.3d at 536.  When Officers Thornton and Schreiber approached the Defendant in the yard, he was essentially flanked by officers.  The officers walked behind the Defendant, guiding him toward the porch.  As the Defendant and the officers walked to the porch, Officer Thornton told the Defendant that when Sgt Coker tells him to do something, he should do it.  Although the Defendant appeared to be submitting to the officer's authority, at this point, once on the porch, the Defendant suddenly attempted to go

into the house. Sgt Coker grabbed his arm, but the Defendant pulled away. Sgt Coker then applied

physical force to restrain the Defendant by causing him to fall face down onto the porch and holding

him there. The Court finds that, at this point, the Defendant was seized for purposes of the Fourth

Amendment, because no reasonable person would have believed he was free to leave.

*2. Reasonable Suspicion*

The Defendant argues that at the time he was seized, the officers lacked either

probable cause to arrest him or reasonable suspicion to conduct an investigatory stop. "[A] brief

investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts'

justifying his or her reasonable suspicion that the suspect has been or is about to be involved in

criminal activity is not an unreasonable seizure." United States v. Martin, 289 F.3d 392, 396 (6th

Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted). Assessing

whether an investigatory stop comported with the Fourth Amendment is a two step process: First,

the Court must determine whether the officer had a reasonable basis for the stop by looking to

whether the officer had reasonable suspicion supported by specific and articulable facts. United

States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its

inception, the Court must examine whether the intrusiveness of the stop was reasonably related to

the situation by reviewing the reasonableness of the officer's actions in the context of the presenting

circumstances. Id.

A court reviewing the legality of an investigative stop must consider the totality of

the circumstances in evaluating the presence of reasonable suspicion. United States v. Arvizu, 534

U.S. 266, 273 (2002); Martin, 289 F.3d at 398. Although an officer may not rely upon a mere hunch

to support a <u>Terry</u> stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." <u>Arvizu</u>, 534 U.S. at 274. Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. <u>Martin</u>, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. <u>Id.</u> at 397.

In examining the totality of the circumstances in the present case, the Court finds that at the time the officers directed the Defendant to the porch and restrained him thereon, they had reasonable suspicion to believe that the Defendant was involved in criminal activity, specifically the fight at 2000 Washington Avenue. The circumstances supporting this finding are (1) the emergency 911 call regarding a fight between three people at 2000 Washington Avenue, (2) the corroborative evidence observed by Sgt Coker that a fight had occurred, and (3) the Defendant's efforts to leave the premises once Sgt Coker arrived.

*(i) 911 call*

Sgt Coker received a radio dispatch and a call screen of a 911 call regarding a fight between a female and two males at 2000 Washington Avenue. Whether the dispatch of the 911 call can provide reasonable suspicion to stop the defendant turns in part upon the call's reliability. Our Supreme Court has recognized a distinction between a report from a known citizen eyewitness and an anonymous tip. "[I]f an unquestionably honest citizen comes forward with a report of criminal activity–which if fabricated would subject him to criminal liability–we have found rigorous scrutiny of the basis of his knowledge unnecessary." <u>Illinois v. Gates</u>, 462 U.S. 213, 233-34 (1983) (citing

_Adams v. Williams_, 407 U.S.143, 146-47 (1972)); _see also_ _United States v. Long_, 464 F.3d 569, 573 (6th Cir. 2006) (affirming the reliability of a 911 call in which the caller gave his address and the police arrived at his residence shortly after the call), _cert. denied_, 549 U.S. 1240 (2007). On the other hand, an anonymous tip that a person of a certain description has committed a crime is insufficient by itself to provide reasonable suspicion to stop the person described. _Florida v. J.L._, 529 U.S. 266, 270-71 (2000); _see_ _United States v. Patterson_, 340 F.3d 368, 371 (6th Cir. 2003). This is true because nothing is known about the anonymous informant's reliability and the tip gives no "predictive" information about the subject's future criminal activities that the officer can attempt to corroborate. _J.L._, 529 at 270; _Patterson_, 340 F.3d at 371 (observing that the reliability of an anonymous tip flows from its ability to predict future actions).

In the present case, whether the 911 caller identified him- or herself is unknown. Although the Government submits in its post-hearing brief [Doc. 19] that the caller identified himself during the call, the Court heard no evidence of this at the suppression hearing. Accordingly, the Court must treat the 911 call as an anonymous tip. As such, the call by itself does not provide reasonable suspicion to stop the Defendant. _See_ _Patterson_, 340 F.3d at 371-72 (holding that in the absence of the anonymous tip, the officers only observed "innocuous behavior"–a group of people walking away from the area upon the officers' arrival–which was insufficient to provide reasonable suspicion to stop them); _see also_ _United States v. Caruthers_, 458 F.3d 459, 465 (6th Cir. 2006). On the other hand, the Court does not "simply dismiss the anonymous call altogether where, as here, other suspicious circumstances also existed." _Id._ To the extent that the call communicated an "'assertion of illegality,'" it along with "other factors, could provide the officers with reasonable suspicion." _Smith_, 594 F.3d at 540.

The instant case is analogous to the circumstances presented in United States v. Smith. Id. In Smith, the responding officers had received a dispatch of a "silent or hang-up 911 call," in which the caller gave no information after dialing 911. Id. The only other information the officers had was the dispatcher's report of sounds of a struggle inside the residence while the line remained open. Id. The Court of Appeals for the Sixth Circuit observed that silent 911 calls are treated like anonymous tips for purposes of a Fourth Amendment analysis and, thus, could not alone provide reasonable suspicion to conduct an investigatory stop. Id. Nevertheless, the Court found that the sounds of a struggle inside the residence permitted the officers to narrow the possibilities for the impetus for the 911 call and suggested criminal activity, thereby permitting the call, in combination with other information, to provide reasonable suspicion. Id. In the present case, the 911 call was not a silent call and, thus, the officers did not have to infer that criminal activity was afoot. Accordingly, the Court finds that the 911 call reporting a fight and, thus, potentially ongoing violence at the residence, is a circumstance that supports a finding of reasonable suspicion when considered in combination with the officers' other observations. See also Caruthers, 458 F.3d at 465 (holding that an anonymous call giving a general description and location of an individual wielding a gun could provide a basis for reasonable suspicion when viewed in combination with other facts).

*(ii) corroborating evidence*

Next, the Court observes that Sgt Coker was able to corroborate several aspects of the 911 call upon his arrival at 2000 Washington. Sgt Coker, who was nearby, drove directly to the residence. At the door, he encountered a male attempting to leave the residence and learned that a female and another male, the Defendant, were inside the residence. Thus, Sgt Coker corroborated the number and the gender of the people reported to have been involved in the fight. The man whom

19

Sgt Coker met at the door was disheveled, bleeding, and appeared to have been in a fight. Additionally, Sgt Coker testified and the audio portion of the recording confirms that the female at the residence was yelling throughout the incident. Sgt Coker testified that these circumstances caused him to believe that something violent had occurred. These observations also serve to corroborate the occurrence of the reported crime, a fight. Although none of the information corroborated is predictive, rather it is all descriptive, the Court finds that these contextual circumstances support a finding of reasonable suspicion that criminal activity had occurred at the residence.

The Defendant argues that his mere presence in an area where criminal conduct occurred is insufficient for a Terry stop. He contends that his presence at 2000 Washington Avenue alone does not provide the necessary *particularized* suspicion of wrongdoing to permit an investigatory detention. The Court finds that Sgt Coker's observations corroborating the 911 call also suggest the Defendant's involvement in the reported fight because he was one of the three unnamed persons in the residence that the caller claimed were involved in the fight. In other words, the caller reported that three persons were involved in a fight, two males and a female. When Sgt Coker arrived at the residence, he found three persons, two males and a female inside. He also observed other circumstances indicating that a fight had occurred–the first man's disheveled appearance and the blood on his face. The Defendant's presence at the residence along with the 911 call and the other corroborative facts provide a particularized suspicion that the Defendant was involved in the fight.

*(iii) Defendant's attempt to leave*

Finally, as Sgt Coker was interacting with the first man, the Defendant walked out

of the residence, stepped off the porch, and proceeded to walk toward Bertrand Street. Sgt Coker testified that based upon his training and experience, the fact that a person attempts to leave the scene of an investigation indicates to him that the person "had done something concerning my investigation, that there was some element of my investigation that may indicate that they had been at fault in whatever we were investigating." When Sgt Coker ordered the Defendant to return to the porch, the Defendant turned and began backing away, while protesting his involvement in anything criminal by stating that he had done nothing. Officer Thornton testified that the Defendant was screaming and characterized him as belligerent. Officer Thornton also stated that based upon his training and experience, when he saw someone trying to leave the scene of an investigation and denying their involvement, such behavior indicated to him that the person wanted to get away because criminal activity had occurred.

The Supreme Court has held that unprovoked flight upon seeing the police is a circumstance that can support reasonable suspicion, although this factor alone is not enough to justify an investigatory stop. Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000); Smith, 594 F.3d at 540. Circumstances short of headlong flight, such as hastily leaving in a "semi-running manner" and "furtive movements made in response to a police presence" may also contribute to an officer's reasonable suspicion. United States v. Caruthers, 458 F.3d 459, 466-67 (6th Cir. 2006) (cautioning against the danger of invoking this factor "cavalierly"); see also United States v. Paulette, 457 F3d. 601, 603, 606 (6th Cir. 2006) (affirming finding of reasonable suspicion based, in part, upon fact that defendant, whom officers had observed engaging in what they believed was a drug transaction, quickly put his hand to his pocket and walked away from the officers upon seeing them). In contrast, merely walking away from the police does not foster a reasonable suspicion. Florida v.

Royer, 460 U.S. 491, 498 (1983); Caruthers, 458 F.3d at 466.

        In the present case, the Defendant's actions went beyond simply walking away from the police, although they may have started out as just that. Upon being asked to return to the porch, the Defendant began screaming that he did not do anything and backing away or shifting from one foot to the other as the other officers approached. After stepping onto the porch, the Defendant made a quick movement to go into the house. When Sgt Coker tried to stop him, he jerked away. The Court finds that this behavior suggested that the Defendant did not want to be questioned by the officers. In Smith, the defendant was leaving the apartment building as officers were arriving in response to an emergency 911 call. 594 F.3d at 540. The defendant was "very agitated and unsettled" and attempted to push through the officers with his head down as they sought to enter the building. Id. The appellate court held that the defendant's "aggressive behavior, which inhibited the officers' efforts to respond to a 911 emergency call, distinguishe[d that] case from other Terry stop situations and contribute[d] significantly to [the court's] finding that the officers had a reasonable suspicion of criminal activity." Id. at 541. The Court finds that the same reasoning is applicable in the present case. Accordingly, the Defendant's actions of attempting to leave and resisting the stop contribute to the officers' reasonable suspicion.

        Thus, the Court finds that based upon the totality of the circumstances, the officers had particularized and reasonable suspicion to stop the Defendant in order to investigate his potential involvement in the criminal activity at 2000 Washington Avenue. The officers' suspicion was not based on a vague hunch but was supported by specific and articulable facts as well as reasonable inferences that the officers were entitled to draw from the circumstances in light of their training and experience. See Arvizu, 534 U.S. at 273 (holding that officers may "draw on their own experience

and specialized training to make inferences from and deductions about the cumulative information available to them" when assessing reasonable suspicion); <u>Smith</u>, 594 F.3d at 542 .

## B. Frisk or Search

The second part of a reasonable suspicion analysis is whether the "'degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'" <u>Caruthers</u>, 458 F.3d at 464 (quoting <u>United States v. Garza</u>, 10 F.3d 1241, 1245 (6th Cir.1993)); <u>Smith</u>, 594 F.3d at 537 (quoting <u>Carruthers</u>). The Defendant argues that even if the officers had a reasonable suspicion to stop and detain him while they investigated the alleged fight, the investigatory detention was unreasonable because the officers conducted a full search of his person. He contends that the officers did not have a reasonable belief that he was armed and dangerous such that would permit them to frisk him. Additionally, he contends that the officers exceeded the bounds of a <u>Terry</u> frisk by searching inside of his pockets. Moreover, he argues that the search incident to arrest exception does not apply because the officers both lacked probable cause to arrest him at the time of the search and because he was not in fact arrested until he was handcuffed and placed in the back of the police car, which occurred after the search of his person.

The Government argues that once the officers approached the Defendant, they had probable cause to arrest him for public intoxication and disorderly conduct based upon the odor of alcohol emanating from his person and the Defendant's aggressive jostling of the officers and shouting. It maintains that once they arrested him, the officers could properly search him incident to his arrest. It contends that such a search incident to arrest was proper even if it occurred just

before the Defendant was arrested because the probable cause to arrest was not based upon the gun or ammunition discovered during the search.

An officer may frisk a suspect for weapons in order to assure the officer's safety if a reasonable officer under those circumstances would be justified in believing the suspect was "armed and dangerous." Terry, 392 U.S. at 27; Smith, 594 F.3d at 542. The Defendant maintains that the officers lacked any reasonable basis to believe that he was armed or dangerous. He points out that the 911 call made no mention of weapons in relation to the reported fight. He also contends that Sgt Coker had not seen any weapons upon his entry into the apartment or during his interaction with the other occupants of the residence.

The Court observes that an officer does not have to be "absolutely certain that the individual is armed" before he can conduct a pat down but must simply be "warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. In the present case, the officers were dispatched to the residence upon a 911 call regarding a fight. Sgt Coker testified that upon his arrival, he encountered a disheveled and bleeding man and a woman yelling, which circumstances caused him to believe that something violent had occurred. While he was attempting to investigate the situation, the Defendant left the residence. Sgt Coker pursued him and ordered him to return. Although he initially resisted, while screaming that he had not done anything, the Defendant returned to the porch of the residence, only to attempt to evade the officers once more through the house. At this time, the Defendant jerked from Sgt Coker's grasp, and Officer Thorton described him as belligerent and aggressive.

The Court also observes that during his encounter with the first man, Sgt Coker discovered that the man was holding and attempting to conceal what Coker believed to be crack

cocaine. Sgt Coker also testified that the female in the residence appeared to be "geeking," which meant that she was under the influence or coming down from the influence of crack cocaine. Thus, Sgt Coker had additional evidence of criminal activity at the residence beyond that reported in the 911 call. Although nothing that Sgt Coker initially observed connected the Defendant to the crack cocaine, the discovery of an illegal drug served to heighten Sgt Coker's need to contain the scene while he investigated what was transpiring at 2000 Washington Avenue.

Based upon the totality of these circumstances, the Court finds that the officers could reasonably believe that the Defendant might have a weapon and that he was a threat to their safety. See United States v. Bell, 762 F.2d 495, 501-02 (6th Cir. 1985) (considering as a circumstance supporting the propriety of the frisk that the defendant did not comply with the officer's order to place his hands on the car's dash). Moreover, given that the Defendant had already tried to flee from the officers into the house, the officers were justified in securing him in such a way that he could not escape while they conducted the frisk. See Caruthers, 458 F.3d at 468.

The Defendant asserts that even if the officers had a reasonable basis to perform a Terry frisk, the search conducted went beyond the bounds of a Terry frisk because Officer Thornton searched inside his pockets. He argues that Officer Thornton's inquiry of whether anything was going to stick him reveals that Thornton intended to reach inside the Defendant's pocket. The Defendant maintains that by reaching inside his pocket, the officer exceeded his authority under Terry and violated the Defendant's constitutional rights.

An officer conducting a Terry patdown, may seize items that he discovers through the sense of touch if the shape or weight of the object causes its incriminating nature to be immediately apparent to the officer. Minnesota v. Dickerson, 508 U.S. 366, 376 (1993) (extending

the plain view doctrine to items discovered through touch). In the present case, the Court finds that

Officer Thornton discovered the gun in the Defendant's pocket by first feeling the gun through the

Defendant's pants. Officer Thornton testified that once the Defendant was lying on the porch, he

decided to "pat[] him down." Officer Thornton described the frisk as follows:

> And as I tried to check Mr. Smith's left side, he kept
> rolling on it. He did that a couple of times, and he
> even pushed my hand away with his arm–kind of
> pushed my hand away when I tried to reach–That's
> why I pushed him over. As I did, I felt the end of a
> gun, pull it out, hand it back to Officer Schreiber with
> my left hand, let him know.

The Court finds that this testimony reveals that Officer Thornton first felt the contour of the gun

through the Defendant's pants as he pushed him back down onto his stomach. Officer Thornton

explained that although he had asked the Defendant whether he would be stuck, he would ask this

question regardless of whether the search was a pat down or inside the pocket because a needle can

slide through the pocket. Moreover, in the testimony referenced by the Defendant, Officer Thornton

states his belief that it did not matter whether he searched inside or merely patted down the

Defendant's pocket because he had already decided that he was arresting the Defendant. The Court

finds that this part of the testimony does not state that he did search inside the Defendant's pocket

initially.

Accordingly, the Court finds that the scope of the investigatory detention, including

the frisk of the Defendant, was reasonable in light of the circumstances, particularly the fact that the

Defendant was aggressive and had attempted to flee. Upon discovery of the gun, the officers had

probable cause to arrest the Defendant for possession of a firearm with intent to go armed. See Tenn

Code Ann. § 39-17-1307(a)(1) (providing that a "person commits an offense who carries with the

intent to go armed a firearm"). Because the Court finds that the officers had reasonable suspicion to stop and to frisk the Defendant, it does not need to reach the Government's argument that the officers had arrested the Defendant before they frisked him and, thus, could properly search the Defendant incident to his arrest. Nevertheless, the Court will also briefly evaluate that basis for the discovery of the gun in the event that the District Court disagrees with this Court's finding of reasonable suspicion.

The Defendant argues that the smell of alcohol is not sufficient to provide probable cause to arrest him for public intoxication and disorderly conduct. An officer may arrest an individual if the officer has probable cause to believe the person has committed or is committing a felony based upon the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 230-31 (1983); United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996). This same standard applies with respect to a misdemeanor offense. Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); Straub v. Kilgore, No. 02-5542, 2004 WL 1193841, *3 (6th Cir. May 27, 2004). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). The Sixth Circuit examined in detail the showing necessary to establish probable cause in United States v. Barrett:

> The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 244 n.13, 103 S. Ct. 2317, 2335 n.13, 76 L. Ed. 2d 527 (1983). . . . . Moreover, the existence of probable cause should be determined on the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed .2d 527 (1983). This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective.

890 F.2d 855, 861 (6th Cir. 1989), superseded on other grounds by 18 U.S.C. § 3742(e); see also

United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993) (also quoting this passage from Barrett).

Additionally, the finding that probable cause existed to arrest an individual is based upon an

objective standard and does not turn upon the officer's subjective belief that he was conducting a

Terry stop as opposed to an arrest. See United States v. Anderson, 923 F.2d 450, 457 (6th Cir.

1991).

      In Tennessee, a "person commits the offense of public intoxication who appears in

a public place under the influence of . . . any . . . intoxicating substance to the degree that . . . [t]he

offender unreasonably annoys people in the vicinity." Tenn. Code Ann. § 39-17-310(a)(3). Here,

the Defendant was in the yard of a residence screaming at police officers in a manner that attracted

the attention of passersby. Officer Thornton testified that when he drew near to the Defendant in

the yard, he could smell the odor of alcohol coming from the Defendant's person. Additionally, he

testified that the Defendant's eyes were bloodshot and the Defendant was belligerent. Sgt Coker

also testified that he smelled alcohol on the Defendant when the Defendant had been subdued on the

porch. The video recordings reveal that the yard of 2000 Washington Avenue was unfenced and

open to the public sidewalk and street. Finally, both Sgt Coker and Officer Thornton testified that

bystanders had gathered across the street in response to the Defendant's yelling. Accordingly, the

Court finds that Officer Thornton had probable cause to arrest the Defendant for public intoxication.[3]

---

[3]The Court questions the Government's assertion that the officers also had probable cause
to arrest the Defendant for disorderly conduct. An individual commits disorderly conduct "who, in
a public place and with intent to cause public annoyance or alarm . . . [e]ngages in fighting or violent
or threatening behavior[.]" Tenn Code Ann. §39-18-305(a)(1). The Court finds no evidence that
the Defendant was yelling and behaving aggressively because he intended to annoy or harm the
public. Instead, the evidence before the Court reveals that his words and actions were directed at
the officers.

Thus, he could properly search the Defendant incident to his arrest.  See United States v. Robinson, 414 U.S. 218, 235 (1973) (holding "that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment");  Chimel v. California, 395 U.S. 752, 762-63 (1969) (holding that a defendant may be searched incident to an arrest without violating the Fourth Amendment).

## C.  Statements

The Defendant argues that any statements he made during the incident on July 3, 2009 were the fruit of an illegal seizure and violated his rights under the Fifth and Sixth Amendments.  The Government concedes that statements by the Defendant after he was arrested and placed in the police cruiser but before he received Miranda warnings are not admissible.  It contends, however, that answers to routine booking questions and any statements by the Defendant after he was advised of his rights should not be suppressed.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself."  In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment.  Miranda v. Arizona, 384 U.S. 436,478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998).  "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

In the present case, Officer Thornton, the arresting officer, testified that he did not advise the Defendant of his rights under Miranda either on the porch when he was detained and

handcuffed or when he was placed in the police car. As an initial matter, the Court rejects the Defendant's contention that any statements that he made during his encounter with the police on July 3, 2009, must be suppressed as the fruit of an illegal seizure. The Court has already found that the Defendant's seizure and the subsequent search of his person did not violate the Fourth Amendment. Accordingly, the statements that the Defendant made on that day were not the product of an illegal seizure.

On the other hand, the Court finds that the Defendant was not provided the <u>Miranda</u> warnings at the time he was taken into custody. The Government concedes that any statements that the Defendant made after his arrest were unwarned and, therefore, inadmissible under the Fifth Amendment. It contends that it will not use these statements, with the possible exception of the Defendant's answers to routine booking questions. Pursuant to this concession and based upon its own factual findings, the Court recommends that any statements made by the Defendant after he was taken into custody and placed in the police car should be suppressed.

Our Supreme Court recognizes a "routine booking question exception which exempts from <u>Miranda</u>'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." <u>Pennsylvania v. Muiz</u>, 496 U.S. 582, 601 (1990) (internal quotes omitted); <u>United States v. Avery</u>, 717 F.2d 1020, 1025 (6th Cir.1983), <u>cert. denied</u>, 466 U.S. 905 (1984) (holding that "[o]rdinarily, . . . the routine gathering of biographical data for booking purposes should not constitute interrogation under <u>Miranda</u>."). Although the Court acknowledges this exception, the Government has failed to point to any specific responses by the Defendant that it seeks to use that would qualify as responses to routine booking questions. Accordingly, the Court cannot determine which, if any, responses are admissible under this exception.

## V.  CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds no basis to suppress the evidence resulting from the seizure and search of the Defendant.  For the reasons set forth herein, the Court **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 11**] be **DENIED in part** in that the Court should decline to suppress the evidence stemming from a seizure and search of the Defendant's person.  Also, the Court **RECOMMENDS** that the Defendant's motion [**Doc. 11**] be **GRANTED in part** in that any statements made by the Defendant after he was taken into custody and placed in the police car, with the exception of responses to routine booking questions, should be suppressed.[4]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[4]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).